IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VICTOR L. YU, M.D.,                              )
                       Plaintiff,          )
                                   )
     vs.                                         ) Civil Action No. 08-933
                                   ) Magistrate Judge Maureen P. Kelly
UNITED STATES DEPARTMENT OF                      )
VETERANS AFFAIRS, et al.,                        )
                     Defendants.        )

MEMORANDUM OPINION

KELLY, Magistrate Judge

      Plaintiff, Victor L. Yu, M.D. ("Dr. Yu"), an employee of the United States Department of

Veteran Affairs ("the VA") for over 28 years as both the Chief of Infectious Disease and the

Head of the Special Pathogens and Clinical Microbiology Laboratory in Pittsburgh ("the Lab"),

has brought this civil action against the United States of America, the VA, the Secretary of

Veterans Affairs, Michael E. Moreland ("Moreland"), the Director of the VA Pittsburgh

Healthcare System, Rajiv Jain ("Jain"), the Chief of Staff of VA Pittsburgh, Ali Sonel ("Sonel"),

the Associate Chief of Staff, Research and Development of VA Pittsburgh, Mona Melhem

("Melhem"), Associate Chief of Staff and Vice President of the Clinical Support Service Line of

the VA Pittsburgh, and the Associate Chief of Staff for Research and Development for VA

Pittsburgh, Steven Graham ("Graham") (collectively, "Defendants"), following the termination

of his employment in August of 2006. Dr. Yu contends that Defendants wrongfully terminated

him, vindictively closed the Lab, destroyed the isolates that had been collected, and withheld

research funds and equipment from him in violation of his constitutional rights and federal law.

Dr. Yu has also brought a state law claim for defamation against Jain.

      Presently before the Court is Defendants' Motion to Dismiss Pursuant to Federal Rules of

Civil Procedure 12(b)(1) and 12(c) or, in the Alternative, Motion for Summary Judgment. For the following reasons, the motion will be granted.

I.     Factual and Procedural Background

Dr. Yu, a board certified physician in internal medicine and infectious diseases, was hired in March of 1978 by the VA Pittsburgh Health Care System as a part-time physician.[1] [ECF Nos. 50-1, p. 5; 50-3]. Although he eventually became the Chief of the Infectious Disease Section as well as the Head of the Lab, Dr. Yu maintained his status as a part-time employee throughout his employment with the VA. [ECF Nos. 56-2, ¶ 5; 50-1, pp. 17-18; 50-3]. The Lab, which was established in 1981 following the outbreak of Legionnaires disease at various VA hospitals around the country, was created to support the clinical work of the VA by determining the presence of Legionella bacteria in human isolates from VA patients and water samples from VA facilities. [ECF Nos. 56-2, ¶6; 56-3, pp. 67-69; 56-6, Response 3]. According to Dr. Yu, in 1996 the hospital director, Thomas Capello, designated the Lab as a Special Clinical Resource in order to expand its testing and research services to hospitals and public health agencies throughout the country, including non-VA entities. The work, which ultimately involved the collection of approximately 4000 isolates, was purportedly financed by fees charged to those who submitted specimens for testing and from grants and donations within the industry. See [ECF No. 56-2, ¶14].

In January of 2006, Melhem requested a routine review the Lab's clinical productivity and financial expenditures. [ECF Nos. 50-9, p. 4; 50-10, p. 2]. According to Defendants, the review not only revealed that the Lab was unproductive and a "drain" on VA resources but that

---

[1] Around the same time, Dr. Yu became as Assistant Professor at the University of Pittsburgh School of Medicine. He eventually became a tenured professor and presently remains employed as such. [ECF 56-2, ¶ 8].

Dr. Yu's research far surpassed what had been authorized by the Research and Development Committee to which all research protocols were to be presented and approved by before the research began. [ECF Nos. 50-9, pp. 4-5; 50-18, ¶ 2.b(2); 50-20; 50-22]. More specifically, Defendants contend that instead of operating for the sole benefit of veterans, Dr. Yu had unilaterally expanded the Lab into a repository for the collection and storage of various Legionella strains and that it had evolved into an unauthorized commercial enterprise operating with a significant financial deficit. [ECF No. 50-9, p. 5]. Dr. Yu, however, contends that the expansion of the Lab's work was done with the knowledge and encouragement of senior VA officials and that the decision to close the Lab was based on incomplete and flawed information obtained by Defendants during unprecedented investigations into the Lab's productivity and his financial accounts. [ECF Nos. 56-2, ¶¶ 15, 24, 25].

Nevertheless, in June of 2006, the decision was made to close the Lab. Dr. Yu was notified that the Lab would be closed and its operations merged into the main clinical lab in a Memorandum dated July 5, 2006. [ECF No. 50-37]. At the same time Dr. Yu was directed to stop all non-clinical activities, including the testing of outside water samples, by July 10, 2006. Id. Dr. Yu requested, and was granted, an extension of time of two weeks to complete the processing of samples that had already been received. [ECF No. 56-16, pp. 22-23]. Although Dr. Yu was reminded in a Memorandum dated July 18, 2006, that no new patient or water samples should be accepted for testing at the Lab, Dr. Yu instructed his technicians to continue processing specimens that continued to arrive from other hospitals and facilities. [ECF Nos. 50-1, pp. 28-29; 50-39; 50-40]. Defendants contend that as a result of this insubordinate conduct,

Dr. Yu was placed on non-duty status with pay on July 21, 2006, and was prohibited from entering the VA facility. [ECF No. 50-41].

In the interim, Dr. Yu spoke to the media contesting the VA's decision to close the Lab and to "raise awareness about the effect the closure of the Lab would have on public health." [ECF Nos. 56, p. 17; 56-2, ¶ 30; 56-38]. He also appealed the decision to close the Lab to Moreland in a Memorandum dated July 12, 2006, asking that the reasons for closing the Lab be reduced to writing so that the erroneous information underlying the decision could be refuted. [ECF No. 56-34]. As well, Dr. Yu wrote a letter to Secretary of Veterans Affairs James Nicholson and asked him to intervene. [ECF No. 56-2, ¶ 31]. Both requests, however, apparently went unheeded and the Lab was officially closed on July 21, 2006.

Thereafter it is undisputed that an Administrative Board of Investigation ("ABI") was convened to investigate Dr. Yu and the various concerns associated with the Lab. Notwithstanding Dr. Yu's contention that the process by which the ABI was organized and conducted its investigation violated multiple VA policies, the Board's report, issued on August 11, 2006, found that Dr. Yu had repeatedly and willfully failed to comply with proper orders of supervisors and that he misrepresented the status of lab projects to a senior VHA official, and recommended that appropriate disciplinary action be taken. [ECF No. 50-33, p. 12]. Dr. Yu's employment with the VA was subsequently terminated on August 18, 2006. [ECF No. 56-46, p. 2]. In the letter from Jain advising Dr. Yu of his termination he was also advised that "[i]n accordance with 38 U.S.C. § 7405 (a)(1)(A) you can be involuntarily separated at any time without advanced notice, and you are not entitled to review of the involuntary separation." Id. Dr. Yu alleges that this representation by Jain effectively denied him any right to appeal that he

may have had either to the Merit System Protection Board or through internal VA procedures. [ECF No. 56, p. 20].

It is undisputed that after the Lab was closed, Dr. Yu attempted to recover equipment and research funds that he had obtained and "dedicated for use in the Lab." [ECF No. 9, ¶ 52]. Despite Dr. Yu's assertion that he maintains an interest in the equipment and funds, Defendants contend that the funds at issue, which were deposited with the Veterans Research Foundation ("VRF"), a nonprofit organization that facilitates medical research and administers funds for VA research, were considered to be the property of the VRF and not any individual investigator. [ECF Nos. 50-26, p. 18; 50-43]. Defendants also represent that the equipment purchased by the VA was transferred to the main clinic lab; that equipment purchased by VRF funds belonged to the VRF and remained with the VA; and that Lab staff members were given the opportunity to transfer off site any other equipment purchased through non-VA funds. [ECF No. 50-9, p. 5].

Dr. Yu also complains that Defendants destroyed his collection of isolates before they could be transferred from the Lab to a laboratory at the University of Pittsburgh despite months of negotiating the necessary steps and proper procedure for doing so. Dr. Yu argues that Defendants' actions not only posed a risk to public health but evidences a collective animus toward him. [ECF Nos. 56, p. 22; 56-53; 56-54; 56-57; 56-58]. Defendants, on the other hand, maintain that the staff at the Lab was instructed to provide a complete inventory of the isolates and consolidate them into an ultralow freezer so that they could be moved to the main clinic lab and that the isolates that were properly labeled and stored were, in fact, transferred. [ECF No. 50-45]. Those that were not properly catalogued or were contained in damaged test tubes, were

considered bio hazardous material and disposed of accordingly. [ECF Nos. 50-9, p. 5; 50-10, p. 4; 50-12; pp. 10-17; 50-17, pp. 8-9].

Dr. Yu filed a twenty-four count complaint on July 3, 2008, which was amended on August 7, 2008 and again on December 2, 2008. [ECF Nos. 1, 2, 9]. In the Second Amended Complaint ("the Complaint"), Dr. Yu brings a myriad of claims challenging Defendants' conduct under the Privacy Act, 5 U.S.C. § 552a(g)(1)(C), the Administrative Procedures Act ("APA"), 5 U.S.C. § 704, and the First and Fifth Amendments to the Constitution, as well as a state law claim for defamation. [ECF No. 9]. Defendants filed a timely Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(c) or, in the Alternative, Motion for Summary Judgment on September 20, 2010, which is now ripe for review.

II.    Standard of Review

"Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim." Samsung Electronics Co. v. ON Semiconductor Corp., 541 F. Supp. 2d 645, 648 (D. Del. 2008). Generally speaking, where the motion presents a facial challenge to the court's jurisdiction, or one based purely on the allegations in the complaint, the court must accept those allegations as true and may consider only the complaint and any documents upon which it is based. Petruska v. Gannon Univ., 462 F.3d 294, 302 n.3 (3d Cir. 2006). Where, however, subject matter jurisdiction is challenged in fact, i.e., where the challenge is based on the sufficiency of jurisdictional fact, as it is here, the court is not required to attach any presumptive truthfulness to the allegations in the complaint but may consider matters outside the pleadings to satisfy itself that it has jurisdiction. Id. See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227

F.3d 62, 69 (3d Cir. 2000).  In either case, the plaintiff bears the burden of persuasion.  <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1409 (3d Cir. 1991).

"Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."  <u>Rosenau v. Unifund Corp.</u>, 539 F.3d 218, 221 (3d Cir. 2008), quoting <u>Jablonski v. Pan Am. World Airways, Inc.</u>, 863 F.2d 289, 290-91 (3d Cir. 1988) (internal quotation marks and citations omitted).  Like a motion filed under Fed. R. Civ. P. 12(b)(6), the Court must view the facts presented in the pleadings and the inferences to be drawn therefrom in the lights most favorable to the nonmoving party."  <u>Id.</u>  Where, however, matters outside the pleadings are presented to and considered by the Court, the motion is properly converted to one for summary judgment.  <u>Id.</u> at 225.  <u>See</u> Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56").

Summary judgment is warranted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  <u>See</u> <u>Conoshenti v. Public Service Electric & Gas Company</u>, 364 F.3d 135, 140 (3d Cir. 2004).  When the moving party has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e) (2).  The mere existence of some evidence favoring the non-moving party, however, will

not defeat the motion. There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). See McGreevy v. Stroup, 413 F.3d 359, 363-64 (3d Cir. 2005). In evaluating the evidence at the summary judgment stage, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. Matreale v. New Jersey Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007).

III.     Discussion

    A.     Subject Matter Jurisdiction

Defendants initially argue that Dr. Yu's complaint should be dismissed for lack of subject matter jurisdiction as his claims are governed by the Civil Service Relief Act ("CSRA"), 5 U.S.C. §§ 7101, *et seq*., which does not provide for judicial review of the type of employment related issues alleged by Dr. Yu concerning the closure of the lab, his termination, the withholding of equipment and funds, and the destruction of isolates.

Recognizing "the haphazard arrangements for administrative and judicial review of personnel action" that often involved appeals of agency decisions to the district courts, Congress enacted the CSRA as a remedial measure so as to "avoid[ ] an unnecessary layer of judicial review in lower federal courts, and [e]ncourage[ ] more consistent judicial decisions . . . . " United States v. Fausto, 484 U.S. 439, 449 (1988). Finding that the CSRA represents a comprehensive and "elaborate remedial scheme that has been constructed step by step, with careful attention to conflicting policy considerations," the Supreme Court has held that the CSRA provides the exclusive remedy to federal employees for claims challenging adverse employment actions. Bush v. Lucas, 462 U.S. 367, 368, 388 (1983) ("Bush"). See Sarullo v.

8

United States Postal Service 352 F.3d 789, 794-95 (3d Cir. 2003) ("Sarullo") ("The CSRA

provides a comprehensive statutory scheme which enables federal employees to obtain remedies

for prohibited personnel practices engaged in by federal agencies").

It is undisputed that Dr. Yu was hired as a part-time physician under 38 U.S.C. §

4114(a)(1)(A), the predecessor to 38 U.S.C. § 7405 (covering temporary and part-time

appointments under Veterans Health Administration statute), and that part-time VA physicians

are generally excluded from the protections and remedies afforded to civil servants under the

CSRA. As pointed out by Defendants, part-time VA physicians are noticeably excluded from

the definition of "employees" who are permitted to challenge adverse employment actions or

personnel actions based upon unacceptable job performance under the CSRA. See 5 U.S.C. §§

4301(2)(C), 7511(b)(10). Under section 2105(f) of the CSRA, however, part-time VA

physicians are considered protected employees in certain limited circumstances, i.e., where a

"prohibited personnel practice" has been taken against them. Section 2302(b) delineates twelve

specific prohibited personnel actions that entitle a part-time VA physician to review.

Defendants contend that none of Dr. Yu's challenged actions fall within any of the twelve

exceptions but rather all relate to adverse employment actions or personnel actions based upon

unacceptable job performance and, thus, are not reviewable. Dr. Yu, however, points to two of

the twelve listed exceptions and argues that they encompass his claims revolving around his

termination and the closure of the lab. Specifically, § 2302 provides, in relevant part:

> (b) Any employee who has authority to take, direct others to take, recommend, or
> approve any personnel action, shall not, with respect to such authority--
>
> (8) take or fail to take, or threaten to take or fail to take, a personnel action with
> respect to any employee or applicant for employment because of--

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences--

\* \* \*

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

\* \* \*

or (12) take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title.

5 U.S.C. §§ 2302(b)(8)(A)(ii); 2302(b)(12). The merit system principles contained in § 2301 state in relevant part that:

(2) All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights.

\* \* \*

(8) Employees should be--

(A) protected against arbitrary action, personal favoritism, or coercion for partisan political purposes . . . .

5 U.S.C. §§ 2301(b)(2) and (b)(8)(A). Dr. Yu then suggests that because "many" of his claims stem from actions taken by Defendants in retaliation for his speaking out in protest of actions that impact public health, which he categorizes as "classic whistle blowing activity," they are protected under the CSRA.

Although, as pointed out by Defendants, Dr. Yu has not used the term "whistle blower" in the Complaint or cited to any provisions of the CSRA, he has alleged that he spoke out

publicly against the VA after it announced the closure of the Lab to raise awareness of the effect the closure would have on public health and that Defendants retaliated against him for doing so by terminating his employment, destroying the isolates and withholding research equipment and funds. [EFC No. 9: ¶¶ 94-97, 129-133, 185-8]. Dr. Yu has also alleged that Defendants' actions were arbitrary and capricious and without regard to his constitutional rights. [ECF No. 9: ¶¶ 72, 78, 83, 105, 111, 117, 133, 140, 146, 152, 167, 178, 184]. These assertions appear to bring Dr. Yu's claims squarely under the "prohibited personnel practice" provisions of the CSRA. See 5 U.S.C. §§ 2105(f), 2302(b). As such, "[h]is remedy, if any, lies within the CSRA procedures."[2] Mangano v. United States, 529 F.3d 1243, 1246 (9th Cir. 2008). Because the CSRA procedures available to Dr. Yu do not include review by this Court consideration of his claims revolving around his termination and closure of the Lab is precluded.

Dr. Yu nevertheless argues that because he had already been terminated when Defendants withheld research equipment and funds from him and destroyed the isolates, those actions by definition are not "personnel actions" contemplated by or subject to the CSRA. Without citing to

---

[2] Under the CSRA, an allegation of a "prohibited personnel practice" may be submitted to the Office of Special Counsel ("OSC") of the Merit System Protection Board ("MSPB"), which must investigate the allegation and determine "whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." 5 U.S.C. §§ 1212(a)(2), 1214(a)(1)(A). Where the allegation submitted to the OSC concerns retaliation for whistle-blowing, review by the MSPB is always available and a final order or decision of the MSPB is subject to judicial review in the United States Court of Appeals for the Federal Circuit. 5 U.S.C. §§ 1214(a)(3), 1221(a), 1221(h), 7703(b). See Mitchum v. Hurt, 73 F.3d 30, 31-32 (3d Cir. 1995). It appears undisputed that Dr. Yu never submitted any allegation of a prohibited personnel action to the OSC. Moreover, Dr. Yu's argument that he was denied his right to do so by Defendants, is unpersuasive. Not only are part-time physicians excluded from the definition of "employee" under the provision relied upon by Dr. Yu for the proposition that employees must be provided with notice of and reasons for a personnel action along as well as information regarding any appeal or grievance rights, see 5 C.F.R. § 752.404; 5 U.S.C. § 7511(b)(10), but the appeal process testified to by Jain and Moreland, which Dr. Yu claims Jain indicated was the was the only method of appeal available to him, clearly refers to the VA's internal appeal process and not that provided under the CSRA. See [ECF No. 156-16, p. 27; ECF No. 156-19, p. 23].

any authority, Dr. Yu then concludes that the CSRA cannot serve to preclude his claims revolving around Defendants' post-termination actions.

Dr. Yu's "post-termination" argument, however, has been rejected by other courts having found that claims which arise out of the "employment relationship" fall within the scope of the CSRA regardless of when the conduct at issue took place. See Lombardi v. Small Business Admin., 889 F.2d 959, 961 (10th Cir. 1989) ("Lombardi"); Newmark v. Principi, 262 F. Supp. 2d 509, 519 (E.D. Pa. 2003). In Lombardi, noting that "it is [the] employment relationship that the Supreme Court emphasized in Bush and its progeny, rather than the nature of the specific violation involved," and that the violations about which Lombardi complained "occurred only as a result of the employment relationship with the Small Business Administration," the court found that they fell within the scope of the CSRA even though the violations took place after he was terminated. Lombardi, 889 F.2d at 961. Moreover, the Court of Appeals for the Third Circuit has cited favorably to Lombardi in Sarullo v. United States Postal Service, 352 F.3d at 796, finding that Sarullo's status as a federal employee was central to his complaint and that, because his claim "related to the employment context," the CSRA provided him with his sole remedy thereby depriving the Court of subject matter jurisdiction. Id. at 797.

Here, to the extent that Dr. Yu claims he has been impacted by the actions of Defendants that took place after he was terminated, his claims arise only by virtue of this employment relationship with the VA. As such, they too fall under the auspices of the CSRA and are subject to whatever preclusive effects that may result.

Further, to the extent that Dr. Yu has attempted to by-pass the CSRA by bringing his claims under *Bivens*, the Privacy Act and the APA, his efforts fail.[3]

1.     *Bivens* Claims

As previously discussed, the Supreme Court has found that the CSRA is a comprehensive statutory scheme that provides exclusive remedies to federal employees for prohibited personnel practices engaged in by federal agencies. Bush, 462 U.S. at 468. See Sarullo, 352 F.3d at 795; Smith v. Pallman, 2011 WL 1167874 (3d Cir. Mar. 30, 2011). In so finding, the Court also held that "it would be inappropriate . . . to supplement that regulatory scheme with a new judicial remedy" and, thus, declined to create a nonstatutory remedy under *Bivens*. Bush, 462 U.S. at 468. Indeed, appellate courts -- including the Court of Appeals for the Third Circuit -- have repeatedly dismissed *Bivens* damage claims arising from an employment relationship as being precluded under the CSRA. See Dotson v. Griesa, 398 F.3d 156, 168 (2nd Cir. 2005); Sarullo, 352 F.3d at 797; Hall v. Clinton, 235 F.3d 202, 204-05 (4th Cir. 2000); Mitchum v. Hurt, 73 F.3d 30, 35 (3d Cir. 1995); Jones v. Tennessee Valley Auth., 948 F.2d 258, 262-64 (6th Cir. 1991); Rollins v. Marsh, 937 F.2d 134, 138-39 (5th Cir. 1991); Saul v. United States, 928 F.2d 829, 838 (9th Cir. 1991); Stephens v. Dep't of Health and Human Services, 901 F.2d 1571, 1576-77 (11th Cir. 1990); Feit v. Ward, 886 F.2d 848, 851-56 (7th Cir. 1989); Hill v. Dep't of the Air Force, 884 F.2d 1318, 1320 (10th Cir. 1989); Montplaisir v. Leighton, 875 F.2d 1, 2-4 (1st Cir. 1989).

_____

[3] "A *Bivens* action, which is the federal equivalent of the § 1983 cause of action against state actors, will lie where the defendant has violated the plaintiff's rights under color of federal law." Brown v. Philip Morris, Inc., 250 F.3d 789, 800 (3d Cir. 2001). Because a *Bivens* action brought against a defendant in his or her official capacity would be the equivalent of pleading an action against the federal agency itself and would be barred by the doctrine of sovereign immunity, these claims are necessarily brought against defendants solely in their individual capacities. Webb v. Desan, 250 Fed. Appx. 468, 471 (3d Cir. 2007), citing F.D.I.C. v. Meyer, 510 U.S. 471, 484-86 (1994) (declining to extend *Bivens* to claims against agencies of the federal government). See Consejo de Desarrollo Economico de Mexicali, A.C. v. United States, 482 F.3d 1157, 1173 (9th Cir. 2007).

See Newmark v. Principi, 262 F. Supp. 2d at 513.

Dr. Yu has brought fifteen claims under *Bivens* alleging Fifth Amendment violations with respect to the closure of the Lab and Fifth and First Amendment violations relating to his termination, the withholding of research equipment and funds, and the destruction of isolates. See [ECF No. 9, Counts 2-4, 7-10, 13-16, 19-22].[4]  Under Bush and its progeny, these claims are precluded under the CSRA and are properly dismissed.

Notwithstanding the above-cited cases, Dr. Yu argues that the particular cases cited by Defendants are distinguishable from the instant case because in those cases, "personnel actions" were being challenged, whereas here the majority of his claims, i.e., those revolving around research funds and equipment and the destruction of isolates, were "post-termination" and cannot be considered "personnel actions."  The Court, however, has already rejected Dr. Yu's argument in this regard finding that his claims arise solely by virtue of his employment relationship with the VA and, therefore, fall within the scope of the CSRA.  Moreover, by so arguing, Dr. Yu appears to concede that his "pre-termination" claims or those challenging the closure of the Lab and his termination are personnel actions governed by the CSRA and are properly dismissed.

Dr. Yu also argues that in many of the cases relied upon by Defendants the plaintiffs had an alternative remedy available to them either under the CSRA itself or some other statute. Because precluding Dr. Yu's *Bivens* claims under the CSRA would leave him without a remedy, he argues that they are not subject to dismissal.

Dr. Yu's argument, however, overlooks Schweiker v. Chilicky, 487 U.S. 412 (1988), in

---

[4] Although Dr. Yu does not expressly state that Counts 4, 20 and 21 are *Bivens* claims, Defendants argue that they are properly construed as such since they have been brought only against individual defendants and there is no such thing as a direct constitutional claim outside of *Bivens*.  Dr. Yu has not addressed Defendants' argument in this regard and, thus, has seemingly concede the issue.  Accordingly, the Court has construed Counts 4, 20, and 21 as *Bivens* claims as well.

which the Supreme Court held that its previous ruling in <u>Bush</u> -- that *Bivens* claims are precluded

under the CSRA -- was equally applicable to the Social Security Act notwithstanding the

unavailability of a complete remedy.  In so holding, the Court made it clear that it is the

comprehensiveness of the statutory scheme at issue that dictates whether a *Bivens* remedy should

be created and not the adequacy of specific remedies provided for in the statute.  <u>Id.</u> at 422-23.

In so finding, the Court not only noted that "[t]he absence of statutory relief . . . for a

constitutional violation . . . does not by any means necessarily imply that courts should award

money damages against the officers for the violation," but indicated that the preclusive effect of

<u>Bush</u> extends even to those claimants within the system for whom the CSRA provides "no

remedy whatsoever."  <u>Id.</u> at 423.  <u>See</u> <u>United States v. Fausto</u>, 484 U.S. at 448.  Numerous courts

have subsequently declined to entertain *Bivens* claims where the CSRA or another

comprehensive remedial scheme govern the claims at issue even when a remedy is no longer

available or the remedy will not fully compensate the plaintiff.  <u>See</u> <u>Dotson v. Griesa</u>, 398 F.3d

at 166-67; <u>Hall v. Clinton</u>, 235 F.3d at 205; <u>Jones v. Tennessee Valley Authority</u>, 948 F.2d at

264; <u>Saul v. United States</u>, 928 F.2d at 840; <u>Lombardi</u>, 889 F.2d at 960; <u>Volk v. Hobson</u>, 866

F.2d 1398, 1402-03 (Fed. Cir. 1989); <u>Spagnola v. Mathis</u>, 859 F.2d 223, 228 (D.C. Cir. 1988).

<u>See</u> <u>also</u> <u>Mangano v. United States</u>, 529 F.3d at 1246 (finding that the plaintiff's claims brought

under the FTCA were precluded under the CSRA); <u>Orsay v. United States Dep't of Justice</u>, 289

F.3d 1125, 428-29 (9th Cir. 2002) (finding the Plaintiff's FTCA claims and Privacy Act claims

were preempted by the CSRA); <u>Schreiber v. Mastrogiovanni</u>, 214 F.3d 148, 151-52 (3d Cir.

2000) (finding that the plaintiff's claims were precluded under the Internal Revenue Code).  As

such, the absence of a meaningful remedy under the CSRA is of no moment and does not serve

to resurrect Dr. Yu's *Bivens* claims. Indeed, Dr. Yu has not cited to any cases that would support a contrary conclusion.

Finally, citing to <u>Mitchum v. Hurt</u>, 73 F.3d 30, 35 (3d Cir. 1995) ("<u>Mitchum</u>"), Dr. Yu argues that even if the Court were to hold that it lacks subject matter jurisdiction over his *Bivens* claims for monetary damages, he is nevertheless entitled to pursue his claims insofar as he seeks equitable and declaratory relief. In <u>Mitchum</u>, the Court of Appeals for the Third Circuit held that, although <u>Bush</u> stands for the proposition that the CSRA precludes the court from exercising jurisdiction over constitutional claims brought by federal employees arising out of the employment context in which damages are sought, it does not deprive the court of jurisdiction over actions where the plaintiff seeks declaratory or injunctive relief. <u>Id.</u> at 35-36. In so finding, the Court sided with the Circuit Court for the District of Columbia, which declined to extend the restriction on *Bivens* damage claims to claims for equitable relief opining that there is a "presumed availability of federal equitable relief against threatened invasions of constitutional interests." <u>Id.</u> at 34-35, <u>citing</u> <u>Hubbard v. EPA</u>, 809 F.2d 1, 11 (D.C. Cir. 1986). Implicit in the Court's decision is the recognition that the power of the federal courts to award equitable relief for constitutional violations arises under 28 U.S.C. 1331, and that the "special jurisprudence" developed by the Supreme Court governing *Bivens* damage claims does not limit the court's authority in that regard. <u>Id.</u> at 34-36. Thus, under <u>Mitchum</u>, the CSRA does not preclude the Court from awarding equitable relief and Dr. Yu's *Bivens* claims are dismissed for lack of subject matter jurisdiction only to the extent that he seeks monetary damages.

2.    Privacy Act Claims

At Counts 1, 6, 12, and 18, Dr. Yu has brought claims under the Privacy Act alleging that Defendants violated the Act by failing to maintain complete and accurate records which led to the closure of the Lab, the termination of his employment, the withholding of research funds and equipment, and the destruction of the isolates.  [ECF No. 9, ¶¶ 61-63; 91-92; 125-127; 159-162].  See 5 U.S.C. § 552a(g)(1)(C).  Citing to a number of cases in which courts have held that claims challenging adverse employment decisions cannot circumvent the CSRA's comprehensive scheme by framing them in as violations of the Privacy Act, Defendants argue that these claims are also preempted by the CSRA and that the Court therefore lacks subject matter jurisdiction. See Orsay v. United States Dep't of Justice, 289 F.3d at 1130 ("[b]ecause Appellants' Privacy Act claims are in fact complaints about "prohibited personnel practices" under the CSRA, we hold that the CSRA precludes consideration of the claims"); Kleiman v. Dep't of Energy, 956 F.2d 335, 338 (D.C. Cir. 1992) (declining to review the plaintiff's challenge to his position classification based on alleged inaccurate information in his personnel file as precluded CSRA"); Henderson v. Soc. Sec. Admin., 908 F.2d 559, 560-61 (10th Cir. 1990) (finding that the plaintiff's Privacy Act claim regarding inaccurate records essentially sought review of the defendant's allegedly improper reinstatement decision and fell within the CSRA's exclusive provisions); Vessella v. Dep't of the Air Force, 1993 WL 230172 at *2 (1st Cir. Jun. 28, 1993)("[t]he Privacy Act permits an individual to seek correction of an agency's inaccurate or incomplete records . . . it cannot be used, however, to frustrate the exclusive, comprehensive scheme provided by the CSRA for federal employee challenges to adverse agency personnel decisions").

In response, Dr. Yu faults Defendants for not citing to any authority from the Third Circuit and complains that the cases upon which Defendants rely are distinguishable because they involve "personnel actions" covered by the CSRA whereas his claims do not.[5]  Notably, Dr. Yu does not cite to any Third Circuit cases either and cites to only one unpublished opinion from the District of Columbia in which the court held "[a] Privacy Act claim survives CSRA preclusion *in this jurisdiction* if a plaintiff shows the harm alleged was 'actually caused' by the alleged violation."  Doe P. v. Goss, 2007 WL 106523 at * 8 (D.D.C. Jan. 12, 2007) (emphasis added).  Not only does the court seemingly recognize that its holding is at odds with that of other jurisdictions but its decision appears to run afoul of Congress' intention that "prohibited personnel practices" be reviewed by the OSC as provided for under the CSRA.  Indeed, § 552(a)(1)(C) allows for judicial review "whenever any agency . . . fails to maintain any record concerning any individual with such accuracy . . . as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record *and consequently a determination is made which is adverse to the individual* . . . ."  5 U.S.C. § 552a(g)(1)(C) (emphasis added).  Thus, to succeed on a claim brought under § 552a(g)(1)(C), a plaintiff must necessarily show that the harm claimed was caused by the alleged violation.  See Skinner v. U.S. Dep't of Justice and Bureau of Prisons, 584 F.3d 1093, 1097 (D.C. Cir. 2009), cert. denied, ___ U.S. ___, 131 S. Ct. 72 (2010) (to make out a claim for damages against an agency for failing to maintain records a plaintiff must allege inaccurate records, agency intent, proximate causation, and an adverse

---

[5] To the extent that Dr. Yu reiterates his argument that his claims regarding destruction of the isolates and the withholding of research equipment and funds are not "personnel actions" and, thus not within the ambit of the CSRA, the Court rejects this argument for the reasons previously stated.

determination); <u>Harry v. United States Postal Service</u>, 867 F. Supp. 1199, 1204 (M.D. Pa. 1994),

<u>aff'd</u>, 60 F.3d 815 (1995) ("pursuant to the Privacy Act, the Plaintiff must show both that his

records were incorrectly maintained and that he suffered an adverse determination as a result of

the wrongful maintenance of his files").  As such, under <u>Goss</u>, every cause of action brought

under § 552a(g)(1)(C) would avoid preclusion under the CSRA.  Clearly this was not Congress'

intent.

Accordingly, the Court finds <u>Finnerty v. United States Postal Service</u>, 2006 WL 54345 at

*10 (D.N.J. Jan. 9, 2006), to be more instructive.  In that case, Finnerty sought damages and

equitable relief under the Privacy Act following his suspension without pay based on a

memorandum created and maintained by Defendants that erroneously reported that he had been

smoking marijuana.  <u>Id.</u> at *8.  Finnerty argued, much like Dr. Yu, that his suspension was the

result of Defendants' failure to keep complete and accurate records.  The Court, however,

concluded that Finnerty's claims constituted an attempt to review an adverse employment

decision and that such collateral attacks "brought under the auspices of the Privacy Act are

preempted by the comprehensive scheme governing employee relations prescribed by the

[CSRA]."  The court also noted that the remedies Finnerty sought under the Privacy Act are

remedies within the purview of the MSPB.  <u>Id.</u> at *9.

Here, like in <u>Finnerty</u>, Dr. Yu's Privacy Act claims, in essence, challenge Defendants'

employment decisions for which he seeks remedies that are normally within the purview of the

MSPB.  Under these circumstances, and consistent with the weight of authority, the Court finds

that Dr. Yu's Privacy Act claims brought at Counts 1, 6, 12, and 18 are precluded under the

CSRA.

3.     APA Claims

Dr. Yu's claims brought pursuant to the APA are similarly dismissed.  The APA expressly provides that it is inapplicable where judicial review is precluded by the relevant statute or where the "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).  See Bowen v. Massachusetts, 487 U.S. 879, 903 (1998) ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action").  As previously discussed, courts have consistently held that the comprehensive nature of the CSRA demonstrates a clear congressional intent to permit federal review as provided therein "or not at all."  Stephens v. Dep't of Health and Human Services, 901 F.2d at 1576, quoting Veit v. Heckler, 746 F.2d 508, 511 (9th Cir. 1984).  See Filebark v. United States Dep't of Transp., 555 F.3d 1009, 1010 (D.C. Cir. 2009), quoting Fornaro v. James, 416 F.3d 63, 67 (D.C. Cir. 2005) (the CSRA "preempts judicial review under the more general APA even when that scheme provides no judicial relief-that is, 'what you get under the CSRA is what you get'"); McAuliffe v. Rice, 966 F.2d 979, 980-81 (5th Cir. 1992) ("the exclusivity of the CSRA precludes application of APA judicial review of McAuliffe's termination"); Stephens v. Dep't of Health and Human Services, 901 F.2d at 1576 (CSRA provides exclusive remedy for preference-eligible, as well as nonpreference-eligible, federal employees who challenge allegedly prohibited personnel practices"); Ryon v. O'Neill, 894 F.2d 199, 201-04 (6th Cir. 1990) (finding that the CSRA "evinces Congress' intention to preclude direct appeal to the federal courts under [the APA]").  Like the plaintiffs in these cases, Dr. Yu may not circumvent the exclusive remedy

provided by the CSRA by seeking protection under the APA and his claims brought at Counts 5, 11, 17 and 23 are properly dismissed as well.[6]

B.    Motion for Judgment on the Pleadings/Summary Judgment

As previously determined, the only claims over which the Court has subject matter jurisdiction are Dr. Yu's *Bivens* claims insofar as he has asked for equitable relief. The Court finds, however, that Dr. Yu has failed to demonstrate that a material issue of fact exists for trial and his *Bivens* claims are properly dismissed as well.

1.    Fifth Amendment *Bivens* Claims

Under the Fifth Amendment, "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. In order to succeed on a claim brought under the Fifth Amendment, a plaintiff must show that: 1) the interest at stake is a constitutionally protected right; 2) that the interest has been threatened or deprived by the defendant; and 3) that the deprivation contravened notions of due process. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972). Defendants argue that Dr. Yu's Fifth Amendment claims are properly dismissed because he is unable to satisfy the first prong or demonstrate that the interests at stake amount to a fundamental interest deserving of due process protection.

Dr. Yu has brought three Fifth Amendment claims revolving around the termination of his employment: at Count 8, Dr. Yu alleges that he had a substantive due process right in his continued employment with the VA; at Count 9, he alleges that he had a protectable property

_____

[6] The cases relied upon by Dr. Yu to support a contrary conclusion are inapposite as, by Dr. Yu's own admission, they concern federal employees who are not governed by the CSRA. Moore v. Glickman, 113 F.3d 988, 992 (9th Cir. 1997) ("ASCS county staff who, like Barbara Moore, are not covered by the CSRA"); Maxey v. Kadrovach, 890 F.2d 73, 75 (8th Cir. 1989).

21

interest in his employment; and at Count 10, he alleges that he had a liberty interest in his employment. Relying largely on <u>Elmore v. Cleary</u>, 399 F.3d 279 (3d Cir. 2005) ("<u>Cleary</u>"), Defendants initially argue that these claims are properly dismissed because as a part-time, "at-will" employee, Dr. Yu has no protected property interest in his employment at the VA.

Although Dr. Yu states in his responsive brief that "[f]or the reasons set forth below, there exists, at a minimum, a question of fact regarding whether he had a protected property interest," he does not set forth any reasons "below" and, thus, has seemingly conceded the issue. Indeed, in <u>Cleary</u>, the Court of Appeals for the Third Circuit held that:

> To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The decisional law is clear that an at-will employee does not have a legitimate entitlement to continued employment because she serves solely at the pleasure of her employer. *Chabal v. Reagan*, 841 F.2d 1216, 1223 (3d Cir.1988). Therefore, once a court determines that a public employee "held [her] position at the will and pleasure of the [governmental entity]," such a finding "necessarily establishes that [the employee] had no property interest" in the job sufficient to trigger due process concerns. *Bishop v. Wood*, 426 U.S. 341, 346 n. 8, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (internal quotations omitted).

<u>Id.</u> at 282.

Here, Dr. Yu does not dispute that he was an "at-will" employee throughout his employment with the VA. See <u>Scott v. Phila. Parking Auth.</u>, 402 Pa. 151, 154, 166 A.2d 278, 280 (1960) (under Pennsylvania law, a "public employee takes his job subject to the possibility of summary removal by the employing authority. He is essentially an employee-at-will"). As such, he had no property interest in his position and his claim at Count 9 is dismissed.

Count 8 of the Complaint is dismissed for the same reason. To succeed on a substantive due process claim the plaintiff must show that he has a property interest that is "fundamental"

under the United States Constitution.  Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 139-40 (3d Cir. 2000).  Because Dr. Yu did not have a property interest in his employment in the first instance, it follows that he did not have a "fundamental" properly right.  Indeed, the Court of Appeals for the Third Circuit has explicitly held that public employment is not a fundamental right entitled to substantive due process protection.  Id. at 142-43.

Dr. Yu nevertheless complains that Defendants have overlooked his claim brought at Count 10 in which he alleges that he had a protected liberty interest in his employment.

"[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest."  Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006), citing Paul v. Davis, 424 U.S. 693, 701 (1976).  See Id. at 239, quoting Doe v. United States Dep't of Justice, 753 F.2d 1092, 1108 n.15 (D.C. Cir. 1985) ("[t]he liberty clause . . . protects reputation, not job tenure, in the government employment context").  The "stigma-plus" standard has been applied in the public context to mean that "when an employer 'creates and disseminates a false and defamatory impression about the employee in connection with his termination,' it deprives the employee of a protected liberty interest," even if the plaintiff had no protectable property interest in his employment.  Id., quoting Codd v. Velger, 429 U.S. 624, 628 (1977).  To satisfy the "stigma" prong of the test, the plaintiff must show that the allegedly stigmatizing statements were made publicly and were false.  Id.

Dr. Yu argues that he has satisfied the stigma-plus standard as evidenced by the fact the he was subjected to several improper and error-laden investigations; that he was defamed both during the investigations and afterward; and that as a result of the investigations, the allegations

against him "spread through the VA and outside the VA." [ECF No. 9, p. 42]. To support his arguments, Dr. Yu cites to the reports generated following the investigations in which it was concluded that he operated an illegal laboratory, was conducting unapproved research and was improperly using research funds. He also points to Jain's testimony in which Jain relayed the fact that he had a conversation with Dr. Arthur Levine, the Dean of the University of Pittsburgh School of Medicine, regarding the concerns surrounding Dr. Yu and the Lab. [ECF No. 56-41; 56-47; 56-16, pp. 10-14].

Dr. Yu, however, has not pointed to any evidence that the reports, even if they contained false information, were made public or disseminated to anyone by any of the Defendants. Rather, Dr. Yu appears to base his claim on the mere fact that an investigation was conducted at all. The fact that inquiries were being made, however, does not in and of itself demonstrate defamation. See Puchalski v. School Dist. of Springfield, 161 F. Supp. 2d 395, 407 (E.D. Pa. 2001) ("To sustain a defamation claim, a plaintiff must prove a defamatory communication was published by the defendant which applied to plaintiff and that the recipient understood its defamatory meaning and understood that the communication was intended to apply to plaintiff"). Moreover, Dr. Yu's defamation claim is brought solely against Jain based on the conversation he had with Dr. Levine in which Jain allegedly falsely told Levine that Dr. Yu was the subject of a criminal investigation; it is not premised on the fact that investigations were being conducted. [ECF Nos. 9, ¶¶ 193-196; 50-1, p. 34].

Further, the portion of Jain's testimony that Dr. Yu has submitted shows only that he had a very brief private discussion with Dr. Levine about an "issue of concern" regarding a "faculty appointment" and "whether there was going to be an investigation." [ECF No. 56-16, pp. 10-

14].  Jain further explained that he was "required to talk to the dean" because the VA Pittsburgh is a "dean's committee hospital" which means that more than 90 percent of the VA faculty has an appointment at the medical school and that where anything of significant concern happens to someone with a faculty appointment at the medical school he informs the Dean.  Moreover, not only is it clear from Jain's testimony that the criminal investigation had not yet begun but Dr. Yu conceded at his deposition that Jain's statement that he was under investigation by the IG was, in fact, true.  [ECF No. 50-1, p. 34].  Under these circumstances, Dr. Yu has failed to satisfy the "stigma-plus" test and Defendants are entitled to summary judgment on Dr. Yu's claim brought at Count 10 alleging that he was deprived of a liberty interest in violation of the Fifth Amendment when he was terminated.[7]

Dr. Yu has also brought Fifth Amendment *Bivens* claims revolving around the closure of the Lab at Counts 2, 3 and 4 of the Complaint.  Defendants again argue that these claims are properly dismissed because Dr. Yu had no constitutionally protected right in the continued existence or operation of the Lab.  Indeed, it is undisputed that the Lab was a government lab organized and operated under the auspices of the VA and subject to the executive decisions of the VA Director.  In fact, Dr. Yu admitted at his deposition that it was not his lab but that of the VA and that he and his staff merely did the work.  [ECF No. 50-1, p. 14].  Absent any argument

---

[7] The Court also notes that although Dr. Yu has alleged in the complaint that his termination and the closure of the Lab has resulted in harm to his standing in the scientific community as well as "his ability to carry out his professional activities," and that he has also experienced "professional losses," he has not identified or provided any specific evidence to support these assertions or a finding that his reputation has been injured.  [ECF No. 9 ¶¶ 36, 57, 117].  In fact, Dr. Yu has not only alleged that "hundreds of physicians and scientists have registered protests about the destruction of the isolates" in apparent allegiance with him, [ECF No. 9, ¶ 58], but the evidence demonstrates that Dr. Yu not only continues to be employed at the University of Pittsburgh Medical School but that he established a private Special Pathogens Lab shortly after his termination where, by his own account, he is able to carry on his professional activities and serve his customers "more effectively."  [ECF No. 50, p. 20, n.4].

or evidence to the contrary, which Dr. Yu has failed to provide, these claims are summarily dismissed as well.[8]

Dr. Yu's Fifth Amendment claims revolving around the withholding of research funds and equipment are subject to a similar fate as Dr. Yu has not provided any evidence that he has a protected interest in either the funds or the equipment. It is undisputed that the funds at issue were deposited with the VRF which is a nonprofit corporation authorized by Congress to serve as a flexible funding mechanism to support VA research programs that directly benefit the care and treatment of veterans. See 38 U.S.C. §§ 7361(a), 7362(a). See also 38 U.S.C. § 7303(a). Under the applicable regulatory scheme, the VRF is authorized to accept gifts and grants from public and private entities but only to further its purpose of caring and treating for veterans; it also has the authority to distribute monies for research and education that has been approved by the VA's Research and Development Committee. 38 U.S.C. § 7364. Notably, Congress did not grant individual investigators such as Dr. Yu the authority to manage research monies deposited into VRF accounts. As such, it is difficult to see how Dr. Yu has any personal entitlement to or protected interest in the monies at issue. See Baraka v. McGreevey, 481 F.3d 187, 205 (3d Cir. 2007), quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. at 577 ("[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it").

Dr. Yu does not dispute that the VRF was created to manage and, in its discretion, distribute funds deposited in its accounts for research and education designed to benefit veterans.

---

[8] Moreover, the equitable relief Dr. Yu seeks in conjunction with the closure of the Lab is merely a declaration that that its closure was improper and contrary to law which would in no way compensate Dr. Yu even if he had a protected interest in the lab. See Discussion, infra.

In fact, Dr. Yu states in his opening brief that the VRF "was formed in 1991 as a non-profit corporation to manage funds generated for research in Pittsburgh VA laboratories, including the [Lab]." [ECF No. 56, p. 12-13]. Rather, Dr. Yu simply argues that the facts of record support a finding that the funds at issue, which were received from Binax, Inc., were designated for use at his discretion for education and research. The only evidence he points to, however, is the letter he drafted for the signature of Binax's Chief Scientific Officer that purportedly memorializes their agreement that the funds submitted by Binax were intended for use at Dr. Yu's discretion to perform research using Binax's urinary antigen for Legionella and Streptococcus. [ECF 56-63]. The letter, however, does not negate the fact that the funds were deposited into a VRF account and, thus, became subject to the laws and regulations governing the management of those funds. Those laws and regulations clearly do not provide Dr. Yu with the power to circumvent the VRF's authority or provide him with an interest in those funds.[9]

Similarly, the record is devoid of any evidence that Dr. Yu has a protected interest in the research equipment at issue. By Dr. Yu's own admission, the equipment did not and does not belong to him but was equipment purchased by the University of Pittsburgh through the VRF. [ECF No. 50-1, pp. 22-24]. The fact that it may have been purchased by funds solicited by Dr. Yu and deposited with the VRF does not render the equipment his or create any personal entitlement to it. As such, Dr. Yu's claims brought at Counts 19, 20 and 21 are subject to summary judgment as well.

---

[9] Moreover, according to Defendants, not only is there is no evidence that Dr. Yu had the approval to conduct research for Binax, Inc. but the research that was contemplated appears to be solely for the benefit of Binax. See [ECF No. 50-51]. Dr. Yu has not provided any evidence to the contrary. The Court also notes here that to the extent Dr. Yu has indicated that research funds from "Roche Corporation" were also wrongfully withheld he has not addressed Defendants' argument with respect to those funds and has apparently abandoned any claim to them.

Finally, Dr. Yu has brought a series of Fifth Amendment claims based on the destruction of isolates at Counts 14, 15 and 16 of the Complaint. As with his other Fifth Amendment *Bivens* claims, Dr. Yu contends that he had a protectable interest in the isolates.

Although not argued by Defendants, the Court notes that the equitable relief sought by Dr. Yu with respect to the destruction of the isolates is a declaration and notice to those who submitted the isolates that they were wrongly destroyed. [ECF No. 9, p. 33]. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

Whether declaratory relief should be granted lies within the court's discretion and should not be granted where the declaratory relief sought "will not serve a useful purpose or is otherwise undesirable." Delaware State Univ. Student Hous. Found. v. Ambling Mgmt. Co., 556 F. Supp. 2d 367, 373 (D. Del. 2008), quoting Gruntal & Co., Inc. v. Steinberg, 837 F. Supp. 85, 89 (D.N.J. 1993). The relevant inquiry is whether the requested relief "will (1) clarify and settle legal relations in issue and (2) terminate and afford greater relief from the uncertainty, insecurity, and controversy giving rise to present action." Id. See Samuel Goldwyn v. United Artists Corp., 113 F.2d 703, 709 (3d Cir. 1940). Moreover, it has been found that "[a] declaratory judgment is inappropriate solely to adjudicate past conduct" and that the "real value of the judicial pronouncement . . . is in the settling of some dispute which affects that behavior of the defendant towards the plaintiff." Delaware State Univ. Student Hous. Found. v. Ambling Mgmt. Co., 556 F. Supp. 2d at 374, quoting Gruntal & Co., Inc. v. Steinberg, 837 F. Supp. at 89.

Here, a declaration and notice to their submitters that the isolates were wrongly destroyed would not settle any legal issue or clarify the relationship between the parties. Nor would it provide relief from the uncertainty giving rise to the proceedings or alleviate the harm that Dr. Yu alleges to have suffered, particularly as it would address only past irreversible conduct. Indeed, such a declaration would not provide Dr. Yu with any practical relief at all but would merely provide him with some sort of personal satisfaction. See United States v. Washington, 759 F.2d 1353, 1362 (9th Cir. 1985) (Ferguson, concurring) (noting that the declaratory relief at issue "affords no relief from the uncertainty giving rise to the proceeding and merely provides a beautiful but hollow statement of principle"). Such relief, however, is not contemplated by the Declaratory Judgment Act and the Court therefore declines to exercise its discretion to grant declaratory relief in this regard. Accordingly, the Court need not address whether or not Dr. Yu had a protected interest in the isolates in the first instance.

### 2. First Amendment Bivens Claims

The above analysis is equally applicable to Dr. Yu's *Bivens* claims brought at Counts 13 and 22 of the Complaint in which he alleges that Defendants retaliated against him for speaking out against the VA's decision to close the Lab by destroying the isolates and refusing to return research funds and equipment in violation of his First Amendment rights. As before, the equitable relief Dr. Yu seeks in relation to the destruction of the isolates, i.e., a declaration and notice to the suppliers that they were wrongfully destroyed, would not clarify the parties' relationship, define the parties' rights or otherwise settle any legal issue. Nor would a declaration provide Dr. Yu with any practical relief. As such, the Court declines to exercise its

29

discretion to grant declaratory relief on Dr. Yu's First Amendment claim revolving around destruction of the isolates and that claim is dismissed.

Similarly, the equitable relief sought by Dr. Yu with respect to his claim that Defendants retaliated against him by refusing to return research funds and equipment is equally unavailing as Dr. Yu seeks only an order from the Court "[p]ermanently enjoining defendants from withholding supplies, equipment, and research funds that were wrongfully withheld . . . ." [ECF No. 9, p. 33].  Because the Court has already found, however, that Dr. Yu has no legitimate entitlement to the funds or the research equipment, it follows that he is not entitled to the requested relief.

The declaratory relief sought by Dr. Yu on his First Amendment claim brought at Count 7, however, would seemingly have a practical effect and serve to settle the parties' relationship as well as afford greater relief from controversy giving rise to present action.  In that claim, Dr. Yu alleges that Moreland and Jain retaliated against him for speaking out about closing the Lab by terminating his employment and asks the Court to award him reinstatement.

To succeed on a First Amendment retaliation claim, a plaintiff must first demonstrate that the activity in question is entitled to First Amendment protection; that is, whether the speech addressed a matter of public concern.  Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006). Once that has been established, the Court must apply the balancing test set forth in Pickering v. Board of Education, 391 U.S. 563, 568 (1968), to determine whether the employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of public services it performs through its employees.  Id.  Once these criteria are met, the plaintiff must show that the protected activity was a substantial or motivating factor in the

alleged retaliatory action. The employer then has the opportunity to show that it would have taken the same allegedly retaliatory action even if the plaintiff had not engaged in the protected activity. Id. Whether or not the conduct at issue is protected in the first instance is a question of law. Id.

Defendants do not challenge the fact that Dr. Yu's speech addressed a matter of public concern but argue that this claim should be dismissed because Dr. Yu has failed to offer evidence that Moreland or Jain participated in the decision to terminate him or that they had any knowledge of his speech at the relevant time. Defendants also argue that Dr. Yu has failed to demonstrate that his interest in the speech at issue outweighs the state's countervailing interest as an employer to promote the efficiency of the public services it performs or that his speech was a substantial or motivating factor in the decision to terminate his employment.

Dr. Yu, however, has submitted a series of emails, some of which were exchanged with Moreland, and portions of Jain's deposition testimony which demonstrates that Moreland and Jain were aware that Dr. Yu had spoken to the media as well as contacted Senator Spector and Congressman Doyle prior to the date on which he was terminated. See [ECF Nos. 63-1; 63-2]. Moreover, it cannot be disputed that Moreland authored the letter dated July 21, 2006, placing Dr. Yu on non-duty status [ECF No. 56-45] and that the termination letter sent to Dr. Yu on August 18, 2006, was signed by Jain. [ECF No. 56-46]. Under these circumstances, it would not be unreasonable for a fact finder to conclude that Moreland and Jain participated in the decision to terminate Dr. Yu's employment.

Defendants also argue, however, that their interests in promoting the efficiency of the public services it performs outweighs Dr. Yu's interest in commenting on a matter of public

concern. Indeed, Jain's termination letter clearly states that "[t]his action is being taken to promote the efficiency of the VA Healthcare System." Id. See Miller v. Clinton Cnty., 544 F.3d 542, 548 (3d Cir. 2008) (an employer's countervailing interests include "the prerogative of removing employees whose conduct impairs performance; and concerns for the morale of the workplace, harmonious relationships among co-workers, and the regular operation of the enterprise"). Dr. Yu has not addressed Defendants' argument in this regard or offered any basis for finding that his interests in speaking out about the Lab's closure outweighs Defendants' interests. Moreover, the record shows that the closure of the Lab did not end the clinical activities being conducted there but that they were simply being transferred to the main clinical laboratory where, presumably, the work would continue. [ECF Nos. 50-37; 56-27. p. 3]. Under these circumstances, it is difficult to see how Dr. Yu's interest in speaking out about the Lab's closure outweighs the VA's interest in promoting the efficiency of the VA Health System.

Most importantly, however, Dr. Yu has failed to point to sufficient evidence from which a fact finder could reasonably conclude that his speaking out was a substantial or motivating factor in the decision to terminate his employment. The only evidence that he has provided is the Tribune Review article dated July 19, 2006, in which his protests over the Lab's closure is memorialized; an email sent to Moreland by a Kathryn Maginnis on July 20, 2006, in which she discusses the media and letter writing campaign initiated by Dr. Yu and suggests a telephone conference to discuss the "new 'allegations'" [ECF No. 63-2, p. 3],[10] and the suspension and termination letters sent to Dr. Yu on July 21, 2006 and August 18, 2006, respectively. This evidence, however, merely catalogues the sequence of events and does not show that the decision

_____

[10] Contrary to Dr. Yu's assertion, it was Ms. Maginnis who suggested that a telephone conference be held; Moreland simply agreed. [ECF No. 63-2, p. 3].

to terminate his employment was a result of his speech. Moreover, the fact that the events were within temporal proximity of each other, standing alone, is of no moment. See Ruiz v. Morris Cnty. Sheriff's Dep't, 2008 WL 2229851 at *7 (D.N.J. May 28, 2008), citing Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2005) ("[a]n adverse action in close proximity to protected speech may warrant an inference of retaliatory motive, but temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision"). Thus, Dr. Yu's evidence does not establish a First Amendment retaliation claim and Defendants are entitled to summary judgment.

C.     Defamation Claim

Finally, Dr. Yu has brought a state law claim for defamation against Jain. Where all claims over which the court has original jurisdiction have been dismissed, the district court may decline to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c)(3). Although declining to exercise jurisdiction is within the discretion of the district court, the court of Appeals for the Third Circuit has held that absent extraordinary circumstances the court should decline to exercise pendent jurisdiction where the federal claims are no longer viable. Bright v. Westmoreland Cnty., 380 F.3d 729, 751 (3d Cir. 2004). Because there does not appear to be any extraordinary circumstances surrounding this case that would warrant the exercise of supplemental jurisdiction over Dr. Yu's defamation claim it appears that it is properly dismissed as well.[11]

---

[11] The Court also notes that Defendants have provided certification that Jain was acting within the scope of his employment as an employee of the United States at the time that the alleged defamation occurred. [ECF 60-1]. As such, Dr. Yu's claim is deemed an action against the United States. 28 U.S.C. § 2679(d)(1). See 28 C.F.R. § 15.4. Because claims for defamation against the United States are barred under the Federal Tort Claims Act, 28 U.S.C. § 2680(h), Dr. Yu's claim is properly dismissed in any event. See Brumfield v. Sanders 232 F.3d 376, 382 (3d Cir. 2000).

IV.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss Pursuant to Federal Rules of

Civil Procedure 12(b)(1) and 12(c) or, in the Alternative, Motion for Summary Judgment [ECF

No. 49] is GRANTED in its entirety.

An appropriate Order will follow.


/s/ Maureen P. Kelly
United States Magistrate Judge


Dated:  5 July, 2011


cc:    All counsel of record via CM-ECF